IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | 2:17-cr-00157 |
| | ) | |
| v. | ) | Chief Judge Mark R. Hornak |
| | ) | |
| JOSEPH IEZZI, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Defendant Joseph Iezzi is currently serving a 120-month sentence for his third bank robbery. In January 2020, Mr. Iezzi was transferred to the Federal Medical Center ("FMC") in Devens, Massachusetts, so that he could have access to the care required for his stage IV kidney disease, including access to dialysis. Shortly after arriving at FMC Devens, Mr. Iezzi filed an administrative request for compassionate release with the Warden of that facility, citing his chronic kidney disease as the reason for release. The Warden denied that request in February 2020. Then, Mr. Iezzi filed an administrative appeal in March 2020, which has not yet been resolved (at least according to the record currently before the Court). After that, Mr. Iezzi filed a second administrative appeal in June 2020, when he had not yet received word from the BOP as to his March 2020 appeal. The BOP recently denied Mr. Iezzi's second appeal in July 2020.

Now, Mr. Iezzi moves for a Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), stating that his kidney disease and other serious medical conditions, as exacerbated by the COVID-19 pandemic, warrant compassionate release. (ECF No. 121.) While the Court finds that Mr. Iezzi's Motion is properly before it, and that his medical conditions rise

1

to an "extraordinary and compelling" level, release is not warranted at this time on the record before the Court. On balance, at least at the present time, Mr. Iezzi can receive appropriate medical care at a Bureau of Prisons ("BOP") specialty medical facility. And when considered in the context of the reality that Mr. Iezzi committed the most recent crimes of conviction while he was afflicted substantially as he is now, the Court concludes that upon consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a), release is not warranted at this time. Accordingly, the Defendant's Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) at ECF No. 121 is DENIED without prejudice subject to its reassertion should circumstances warrant.

## I.   BACKGROUND

On November 17, 2017, Mr. Iezzi pleaded guilty in the above-captioned matter to his third federally-prosecuted bank robbery.[1] On these charges, he was sentenced to an aggregate of 120 months in custody, followed by three (3) years of supervised release. (ECF No. 68.) As of the date of this Opinion, Mr. Iezzi has served about forty (40) months of actual incarceration and the BOP lists Mr. Iezzi's release date as September 20, 2025.

At the time of sentencing, the Court was made aware of Mr. Iezzi's several significant health conditions, including chronic kidney disease, diabetes, gout, hypertension, elevated cholesterol, and acid reflux. (ECF No. 54, at 15.) In addition, Mr. Iezzi's medical provider noted that his "various chronic conditions put him at a slightly elevated risk of heart disease." (*Id.*)

The state of Mr. Iezzi's chronic kidney disease—then and now—requires some unpacking, as it is central to the current Motion before the Court. Mr. Iezzi was diagnosed with chronic kidney disease in 1998. (ECF No. 54, at 15.) As of May 2016, Mr. Iezzi's kidney disease

---

[1] Mr. Iezzi pleaded guilty to his first bank robbery on November 25, 2002, in criminal case No. 02-cr-00198. And he pleaded guilty to his second bank robbery on August 23, 2005, in criminal case No. 04-cr-312.

was classified as stage III.[2] (ECF No. 62-2, at 1.) By November 2017, Mr. Iezzi's kidney function was "nearing Stage V" and his medical provider stated that Mr. Iezzi would need to begin dialysis once reaching end-stage, which would likely occur within the next ten (10) years. (ECF No. 54, at 15.) In January 2019, Mr. Iezzi's nephrologist noted that he had reached severe stage IV and that his kidneys were working at about twenty (20) percent. (ECF No. 121-1, at 2.) At that time, it was also recommended that Mr. Iezzi have a fistula created in order to prepare for dialysis. (*Id.*) Mr. Iezzi had an arterial venous fistula created in July 2019. (ECF No. 121-4, at 1.) As of December 2019, Mr. Iezzi's kidney disease remained classified as severe stage IV and his medical provider advised him that he would likely reach end-stage and be in the need of dialysis by Summer 2020. (ECF No. 121-6, at 2–3.) Medical records generated by the BOP on July 27, 2020, continue to classify Mr. Iezzi's kidney disease as "stage 4 (severe)." (ECF No. 140-1, at 3.) As of the date of this Opinion, the Court has not yet received notice that Mr. Iezzi has reached end-stage, or that he has begun dialysis.

In January 2020, Mr. Iezzi was transferred from FCI Allenwood to FMC Devens, where he was designated to their Chronic Care Clinic as a "Care Level 4" inmate. (ECF No. 121, at 3.) At the telephonic hearing before the Court on April 22, 2020, counsel for the United States advised the Court that FMC Devens provides dialysis for approximately 100 inmates and that there is an "in-house" physician designated to deal specifically with dialysis. It thus appears that FMC Devens is a center within the BOP for the care of inmates with chronic and significant kidney conditions.

---

[2] There are five (5) stages of chronic kidney disease: (1) at stage I, an individual's kidneys function at 90 percent or higher; (2) at stage II, an individual's kidneys function at 60–89 percent, which does not require radical treatment; (3) at stage III, an individual experiences "moderately reduced kidney function" and their kidneys operate at about 30–59 percent; (4) stage IV is marked by "severely reduced kidney function" and an individual "may be feeling quite ill at this stage," as their kidneys only function at about 15–29 percent; and (5) at stage V, an individual's kidneys function at less than 15 percent and they are either waiting for a kidney transplant or are on dialysis. *What are the Stages of Chronic Kidney Disease?*, National Kidney Foundation (last visited August 7, 2020), https://bit.ly/30eB0u8.

On January 23, 2020, the Warden of FMC Devens received an administrative request for compassionate release from Mr. Iezzi, which identified his kidney disease as a "terminal illness" warranting release. (ECF No. 121-1, at 3.) That request was denied by the Warden on February 4, 2020, because Mr. Iezzi's medical records indicated that his "circumstances [were] not extraordinary or compelling," and as such the Warden found release to be inappropriate at that time. (ECF No. 121-1, at 2.) In reaching that conclusion, the Warden engaged in a global review of Mr. Iezzi's overall medical condition and status, and considered the entirety of Mr. Iezzi's medical history, rather than only the singular condition identified by Mr. Iezzi in his administrative request for release. (*Compare* ECF No. 121-1, at 3 (identifying Mr. Iezzi's "kidney disease" as a "terminal illness" warranting compassionate release), *with* ECF No. 121-1, at 2 (considering Mr. Iezzi's entire "medical record," including his "chronic kidney disease stage IV, hypertension, diabetes mellitus type II, benign prostate hypertrophy, left knee osteoarthritis, dyslipidemia, gastroesophageal reflux disease, anemia of chronic kidney disease, gout, and hypothyroidism," before denying his administrative request for release).) In short, the Warden considered the entire picture of Mr. Iezzi's medical condition and status at the time he reviewed Mr. Iezzi's administrative request for release.

Mr. Iezzi appealed the Warden's decision up the BOP chain of command on March 16, 2020, stating that he "suffer[s] from numerous serious and advanced medical issues" and that the delay in proceedings continued to put his life at risk. (ECF No. 144-1, at 1.) As of June 5, 2020, Mr. Iezzi had not yet heard from the BOP as to his March 2020 appeal, and he therefore submitted a second appeal to the BOP on that date. (*Id.* at 3.) That second appeal identified that Mr. Iezzi was seeking compassionate release due to his medical conditions and specifically stated that he is at "high risk of getting and dying from COVID-19." (*Id.*) The BOP received Mr.

4

Iezzi's second appeal on June 19, 2020, and it denied that appeal on July 13, 2020, primarily because Mr. Iezzi failed to attach a copy of his initial administrative request for release, or the warden's denial of such request, to the appeal.[3] (*Id.* at 4.)

In the time since Mr. Iezzi filed his initial administrative request for compassionate release with the BOP, the Secretary of Health and Human Services declared a public health emergency in response to the COVID-19 outbreak, the World Health Organization characterized the COVID-19 outbreak as a pandemic, and the President of the United States declared that the COVID-19 outbreak in the United States constitutes a national emergency. *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, The White House (Mar. 13, 2020), https://bit.ly/3fz5m0J. And this Court has issued nearly twenty (20) Administrative Orders aimed at dealing with that pandemic in the context of the Court's administration of justice.

Then, on April 15, 2020, counsel for the Defendant filed a Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) at ECF No. 121. Essentially, that Motion argues that Mr. Iezzi's chronic and progressive kidney disease, along with his other medical conditions—all of which are exacerbated by the COVID-19 pandemic—rise to an "extraordinary and compelling" level, such that compassionate release is warranted. The Defendant therefore argues that the Court should reduce his in-custody sentence to "time served." (ECF No. 121, at 17.)

---

[3] Because the BOP's July 13, 2020, denial only mentions an appeal that it received on June 19, 2020, and because this Court has not received any other record indicating that Mr. Iezzi's initial appeal has been denied, Mr. Iezzi's initial appeal (submitted on March 16, 2020) presumably remains pending before the BOP. *See* 28 C.F.R. § 571.63(a) ("When an inmate's request [for compassionate release] is denied by the Warden, *the inmate will receive written notice* and a statement of reasons for the denial.") (emphasis added). Importantly for these purposes, in the case of each of Mr. Iezzi's appeals, the BOP has either affirmatively denied the appeal, or has had it in hand for far more than thirty (30) days.

In response, the Government initially argued that Mr. Iezzi's COVID-19-related concerns were not properly before the Court because his initial administrative request before the BOP only sought compassionate release based on his kidney disease—not COVID-19.[4] (ECF No. 125, at 9–10.) After conferring with counsel for the Defendant in July 2020, however, current counsel for the United States represented that the Government "agrees with Mr. Iezzi that the pending motion for compassionate release is ripe for decision." (ECF No. 144, at 2.) And at the telephonic argument before the Court on May 8, 2020, counsel for the United States asserted that Mr. Iezzi remains a danger to the community, in that he has a history of violating the terms of his supervised release and the suggested third-party custodian (his 93-year-old mother) would be unable to deter or prevent him from committing further offenses.

Counsel for the Defendant filed a Reply at ECF No. 126, followed by supplements at ECF Nos. 129, 130, 140, and 144, all of which either advise the Court as to the Defendant's health status or the pendency of his administrative request before the BOP. The Court held telephonic oral argument on April 22, 2020, and on May 8, 2020. This matter is now ripe for disposition.

## II. <u>LEGAL STANDARD</u>

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007); *see also Dillon v. United States*, 560 U.S. 817, 819 (2010) ("A federal court generally may not modify a term of imprisonment once it has been imposed."). One such specific authorization is the First Step Act's amendment of 18 U.S.C. § 3582. As amended, that provision

---

[4] The Government's written Response contested exhaustion as to any of Mr. Iezzi's medical conditions aside from his kidney disease. (ECF No. 125, at 3–9.) However, at the telephonic hearing before the Court on April 22, 2020, counsel for the United States informed the Court that the Government's exhaustion arguments on the table at that time were limited to Mr. Iezzi's COVID-19-related concerns. As noted below, events have now plainly overtaken that argument.

allows a court to modify a defendant's term of imprisonment if "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i). In addition, the court must consider: (1) whether the defendant has exhausted the appropriate administrative remedies; (2) the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable; and (3) whether such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. § 3582(c)(1)(A).

## III. **DISCUSSION**

After considering the relevant factors, the Court finds that Mr. Iezzi's Motion is properly before it, including his COVID-19-related concerns. Additionally, the Court finds that Mr. Iezzi's medical conditions, as exacerbated by his particularized risk for severe illness should he contract the COVID-19 virus, rise to an "extraordinary and compelling" level. However, in also considering the § 3553(a) factors as the Court is obligated to do, the Court finds that Mr. Iezzi remains a risk to the community, and that compassionate release is inappropriate at this time.

### A. **Administrative Exhaustion**

In order to consider the merits of the Defendant's Motion, the Court must first determine whether Mr. Iezzi has complied with § 3582(c)(1)(A)'s exhaustion requirement. Prior to petitioning a court for relief under § 3582(c), a defendant must first file an administrative request for compassionate release with the warden of their facility and then either: (1) fully exhaust the BOP's administrative remedies; or (2) wait thirty (30) days from the date their administrative request was filed with the warden. § 3582(c)(1)(A). And the Third Circuit recently confirmed that either of § 3582(c)(1)(A)'s options (acting independently) are sufficient to satisfy the exhaustion requirement. *See United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020) (rejecting the argument that a defendant is required to completely exhaust the administrative

remedy process if the warden denies a defendant's request within thirty (30) days of receiving it, primarily because "the statute states that the defendant may file the motion [before a district court] thirty days after the warden receives his request").

Here, the Government does not contest the Court's authority to adjudicate the Defendant's Motion based on lack of exhaustion. While the Court does not dispute that assertion and accepts the Government's position that Mr. Iezzi's Motion is ripe for disposition, the Court must nonetheless determine whether exhaustion is satisfied because our Circuit has held that § 3582(c)(1)(A)'s exhaustion requirement is mandatory.[5] *See United States v. Raia*, 954 F.3d

---

[5] A number of courts have addressed the issue of whether § 3582(c)(1)(A)'s exhaustion requirement is jurisdictional. *United States v. Davis*, No. 17-cr-69, 2020 WL 3976970 (M.D.N.C. July 14, 2020) (collecting cases). Most have concluded that the exhaustion requirement does not go to a court's adjudicatory power in the nature of "subject matter jurisdiction" but is better considered as akin to a "claim-processing rule" that limits a court's remedial authority when properly raised. *See, e.g.*, *United States v. Alam*, 960 F.3d 831, 833–34 (6th Cir. 2020) ("In appearance, [§ 3582(c)(1)(A)'s exhaustion requirement] looks like a claim-processing rule, and in operation it acts like one."). And this Court believes that such an approach is the better view, since the statute itself does not purport to strip the district courts of adjudicatory authority. What we do know is that in our Circuit, the exhaustion requirement is a gateway to relief because "[w]hether jurisdictional or not, [exhaustion under § 3582(c)(1)(A)] is clearly a mandatory requirement, as made clear by the Third Circuit in *Raia*." *United States v. Somerville*, --- F. Supp. 3d ----, 2020 WL 2781585, at *5 (W.D. Pa. May 29, 2020); *see also United States v. Contreras*, No. 17-cr-1872, 2020 WL 4530738, at *2 (S.D. Cal. Aug. 6, 2020) ("This Court need not reach the jurisdictional question because even if the exhaustion requirement in § 3582(c) is non-jurisdictional, it is mandatory and precludes the Court from modifying Defendant's sentence."). While categorization of the exhaustion requirement remains an open question in our Circuit, it appears to this Court to not limit the Court's authority to adjudicate the claim, but also appears to be somewhat hybrid in nature, given the verbiage that our Court of Appeals applied in *Raia* regarding its mandatory nature. *See Raia*, 954 F.3d at 597 ("Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance.").

In addition, in *Alam*, the Sixth Circuit analogized the exhaustion requirement in § 3582(c)(1)(A) to the administrative filing obligation in Title VII of the Civil Rights Act of 1964. While appealing, such an analog does not appear to be a perfect fit, since in the Title VII context there are at least two (2) entities with an interest in enforcing the administrative hurdle, namely the EEOC or the charged respondent. Here, no similar analog agency is before the Court. While the United States Attorney's Office typically weighs in on the merits of motions for compassionate release that eventually come before a district court, that "agency" does not automatically stand in the shoes of the BOP if the exhaustion requirement is not carried out. And, when the United States Attorney's Office does address a motion for compassionate release, it does not appear to the Court that the central purpose of doing so is to represent the BOP. Thus, whether § 3582(c)(1)(A)'s exhaustion requirement can be waived, forfeited, or conceded, as is the case with the administrative filing obligation in Title VII, is not so clear. But resolving that issue does not change the Court's analysis at this juncture because even if the Government concedes as it does here that the exhaustion requirement has been met in Mr. Iezzi's case, the Third Circuit's precedential opinion in *Raia* suggests that failure to comply with the exhaustion requirement "presents a glaring roadblock foreclosing compassionate release." 954 F.3d at 597. As such, this Court must confirm that Mr. Iezzi has complied with

594, 597 (3d Cir. 2020) (mandating "strict compliance" with § 3582(c)(1)(A)'s exhaustion requirement); *see also United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [§ 3582(c)(1)(A)'s] exhaustion requirement does not implicate our subject-matter jurisdiction, it remains a mandatory condition.").

In any event, the Court finds that Mr. Iezzi has satisfied § 3582(c)(1)(A)'s exhaustion requirement based on the "thirty-day option" because the BOP has had more than thirty (30) days to consider all of the claims he is now attempting to bring before this Court. Mr. Iezzi's initial administrative request for release was put before the Warden of FMC Devens on January 23, 2020, and sought release based on his "kidney disease." (ECF No. 121-1, at 3.) The Warden denied that request on February 4, 2020, after reviewing Mr. Iezzi's entire medical record. (*Id.* at 2 (considering Mr. Iezzi's "chronic kidney disease stage IV, hypertension, diabetes mellitus type II, benign prostate hypertrophy, left knee osteoarthritis, dyslipidemia, gastroesophageal reflux disease, anemia of chronic kidney disease, gout, and hypothyroidism").) Since then, Mr. Iezzi has twice appealed the Warden's denial, one such appeal remains pending (at least according to the record currently before the Court) and the other such appeal was recently denied on July 13, 2020. (*See* ECF No. 144.) As such, the Court finds that as of at least February 4, 2020, the BOP was aware of Mr. Iezzi's request for compassionate release (based on all of the medical conditions listed in his BOP file) and that much more than thirty (30) days have passed since then.

Beyond that, Mr. Iezzi's COVID-19-related concerns have also been before the BOP for at least thirty (30) days. As noted above, Mr. Iezzi submitted a second appeal of the Warden's February 2020 denial to the BOP on June 5, 2020, and the BOP received that appeal on June 19,

---

§ 3582(c)(1)(A)'s exhaustion requirement to the extent that it is a gateway to the relief he seeks, even if it does not go to the Court's "subject matter jurisdiction."

2020. (ECF No. 144-1, at 3–4.) Importantly, that second appeal specifically stated that Mr. Iezzi's request for compassionate release was based in part on his concerns surrounding the ongoing COVID-19 pandemic because he is at "high risk of getting and dying from COVID-19." (*Id.* at 3.)

And in the Court's estimation, it does not matter that the BOP denied Mr. Iezzi's second appeal on what should be fairly described as internal procedural grounds (e.g., Mr. Iezzi's alleged failure to attach paperwork from his first BOP appeal). What matters is that the BOP received the request (identifying the primary reasons for release) and that Mr. Iezzi allowed the BOP at least 30 days to take the "first crack" at resolving his request at the administrative level. *See Harris*, 812 F. App'x 106, 2020 WL 4048690, at *1 (3d Cir. 2020) ("the statute states that the defendant may file the motion [before the district court] thirty days after the warden *receives his request*") (emphasis added). Mr. Iezzi's June 2020 appeal allowed for exactly that—it explicitly informed the BOP of his COVID-19-related concerns nearly two (2) months ago. As such, the Court finds that as of at least June 19, 2020, the BOP was made aware of Mr. Iezzi's request for compassionate release based in part on COVID-19-related grounds and that more than thirty (30) days have passed since then.[6]

---

[6] The Court would also note that the BOP was likely more than put on "notice" of Mr. Iezzi's COVID-19-related concerns several months before he submitted his second administrative appeal, the one which specifically mentions COVID-19. As of April 5, 2020, the BOP has been advising the public that it is considering *all* inmates for placement on home confinement (the exact request before the Court in Mr. Iezzi's case) because of that very same pandemic: "**Inmates do not need to apply to be considered for home confinement.** Case management staff are *urgently* reviewing all inmates to determine which ones meet the criteria established by the Attorney General on March 26, 2020 and April 3, 2020. The Department has also increased resources to review and make appropriate determinations as soon as possible." *Update on COVID-19 & Home Confinement: BOP Continuing to Aggressively Screen Potential Inmates*, Federal Bureau of Prisons (last updated April 5, 2020) (italicized emphasis added), https://bit.ly/2CbBxFg. And while any such consideration by the BOP would be pursuant to its authority under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") as opposed to § 3582, that doesn't change the fact that the BOP is currently considering (or has already considered) the impact of COVID-19 on each and every inmate in its custody, at least according to the assertion made on its website. As such, it would be contrary to the BOP's own important public statements as to its own COVID-19-centered concerns and policies to now say that the BOP did not consider (or is not currently considering) Mr. Iezzi's March 15, 2020, appeal in the context of the

In sum, the record in Mr. Iezzi's case demonstrates that all exhaustion-related goals have actually been accomplished, and the exhaustion requirement has been met. The Third Circuit has suggested that the fundamental premise of § 3582(c)(1)(A)'s exhaustion requirement is to give the BOP the first opportunity to consider whether release is appropriate. *Raia*, 954 F.3d at 597 ("Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance."). In Mr. Iezzi's case, the record before the Court plainly demonstrates that the BOP has had more than thirty (30) days to consider the Defendant's overall medical condition, including consideration of those concerns in the context of the COVID-19 pandemic. Mr. Iezzi has for the reasons noted above exhausted his BOP administrative obligations, both as to his medical conditions generally and as to his particularized COVID-19-related concerns, which the United States has also acknowledged. The Court will proceed accordingly.

### B.  **"Extraordinary and Compelling" Reasons**

Next, the Court must determine whether Mr. Iezzi's several medical conditions, as exacerbated by the ongoing COVID-19 pandemic, rise to an "extraordinary and compelling" level, such that release could be warranted under § 3582(c)(1)(A)(i).

Section 3582 does not define the phrase "extraordinary and compelling reasons." Instead, Congress delegated that task to the Sentencing Commission. *See* 28 U.S.C. § 994(t) (stating that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). The Sentencing Commission defined "extraordinary and compelling" as it related to the BOP's discretion under the pre-First Step Act version of § 3582(c)(1)(A)(i), but has

---

COVID-19 pandemic. The public pronouncements of the BOP each announce that the BOP is already doing just that.

not updated the applicable Policy Statement, found in the U.S. Sentencing Guidelines Manual ("the Guidelines") § 1B1.13, since the First Step Act became law. *See United States v. Rodriguez*, --- F. Supp. 3d ----, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020).

Despite the fact that the relevant portions of the Guidelines predate the passage of the applicable provisions of the First Step Act, and would be advisory in any event, they do provide some initial benchmarks for the Court's consideration. *See id.* at *4 ("[A] majority of district courts have concluded that the 'old policy statement provides helpful guidance, [but] . . . does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A).'") (quoting *Beck*, 425 F. Supp. 3d at 582). For example, the Policy Statement provides that a defendant may show "extraordinary and compelling" reasons for compassionate release based on the defendant's medical condition, age, family circumstances, or "other reasons." § 1B1.13, cmt. n.(1).

Particular to Mr. Iezzi's situation, the Application Notes to § 1B1.13 of the Guidelines speak to conditions which would support compassionate release in the form of two (2) different medical conditions that can rise to an "extraordinary and compelling" level: (1) terminal illnesses; and (2) non-terminal conditions that substantially diminish the ability of the defendant to provide self-care within the correctional environment. Here, the Court finds that the combination of Mr. Iezzi's several conditions, paired with the additional risks he faces due to the COVID-19 pandemic, rise to an "extraordinary and compelling" level pursuant to the "non-terminal" option.

### 1. <u>The Terminal Illness Option</u>

First, the Court finds that Mr. Iezzi does not yet qualify for relief under the "terminal illness" option, because his kidney failure has not yet reached a "terminal" stage.

The relevant Application Note suggests that a defendant suffers from a "terminal illness" if they are afflicted with "a serious and advanced illness with an end of life trajectory." § 1B1.13, cmt. n.(1)(A)(i). A "specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required" to prove that an illness is "terminal." *Id.* Examples of terminal illnesses provided by the Guidelines include "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." *Id.*

Several courts have found that end-stage kidney failure rises to an "extraordinary and compelling" level, largely because § 1B1.13 specifically lists "end-stage organ disease" as an example of a "terminal illness." *See, e.g.*, *United States v. Muniz*, --- F. Supp. 3d ----, 2020 WL 1540325, at *2 (S.D. Tex. Mar. 30, 2020); *United States v. Saad*, No. 16-cr-20197, 2020 WL 2065476, at *4 (E.D. Mich. Apr. 29, 2020); *United States v. Williams*, No. 04-cr-95, 2020 WL 1751545, at *3 (N.D. Fla. Apr. 1, 2020); *United States v. Mitchell*, No. 09-cr-26, ECF No. 144, at 6 (N.D. Fla. Feb. 3, 2020).

Here, however, Mr. Iezzi's kidney failure has not yet reached end-stage. While it is anticipated that Mr. Iezzi will reach end-stage at some point in the time to come, and that he will require dialysis once he reaches that stage, his kidneys are still operational as of today (albeit only at about 20 percent or less). As such, in relying on the information currently before it, the Court finds that Mr. Iezzi does not yet qualify for compassionate release based upon his affliction with a "terminal illness."

## 2. The Non-Terminal Illness Option

The Court, however, does find that Mr. Iezzi could qualify for relief under the "non-terminal" illness option, especially in the context of the COVID-19 pandemic. The Sentencing Commission's Policy Statement suggests that non-terminal medical conditions may constitute

extraordinary and compelling reasons if "a defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." § 1B1.13, cmt. n.(1)(A)(ii).

Here, there is no doubt that Mr. Iezzi is suffering from a serious medical condition from which he is not expected to recover: severe stage IV kidney disease. And the record indicates that on some level Mr. Iezzi's kidney disease has reached a stage at which his ability to care for himself while in custody has diminished. For example, counsel for the Defendant reports that Mr. Iezzi "spends most of his waking hours in bed because he is so exhausted." (ECF No. 121, at 4; *see also* ECF No. 121-6, at 2 (stating that Mr. Iezzi "has no energy and sleeps a lot").)

The Court also notes that when Mr. Iezzi was transferred to FMC Devens in January 2020, he was designated as a "Care Level 4" inmate, which is the BOP's highest care-level classification. Additionally, those assigned to Care Level 4 "require services available only at a BOP Medical Referral Center (MRC), which provides significantly enhanced medical services" and their "[f]unctioning may be so severely impaired as to require 24-hour skilled nursing care or nursing assistance." *Care Level Classification for Medical & Mental Health Conditions or Disabilities*, Federal Bureau of Prisons (May 2019), https://bit.ly/3gYZJcw. It is also worth noting that individuals with kidney disease qualify for "Care Level 4" once they begin dialysis. *Id.* at 16. Here, Mr. Iezzi has not yet begun dialysis, but is classified as Care Level 4. That is an indication of the severity of his current condition.

It also appears to the Court that the COVID-19 pandemic has further diminished Mr. Iezzi's ability to care for himself while in custody. For instance, Mr. Iezzi was scheduled to meet with a nephrologist in April 2020, to monitor the progression of his kidney failure, but "he [was]

14

advised that the appointment was cancelled due to COVID-19 policy changes." (ECF No. 121, at 4.) The Court presumes that those "policy changes" were instituted by the BOP generally or as to FMC Devens specifically. In addition, counsel for the Defendant informed the Court that she was unable to "provide the Court with clear information concerning the progression of Mr. Iezzi's chronic kidney disease" as of July 2020 because Mr. Iezzi "has not seen a nephrologist since before the COVID-19 pandemic" began. (ECF No. 140, at 2.)

And on top of that, Mr. Iezzi has several conditions that place him at higher risk of severe illness should he contract the COVID-19 virus. In *United States v. Raia*, the Third Circuit held that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's . . . extensive and professional efforts to curtail the virus's spread." 954 F.3d at 597. In other words, a defendant's motion for compassionate release based in part on COVID-19-related concerns must move beyond "citing to nationwide COVID-19 statistics, asserting generalized statements on conditions of confinement within the BOP, or making sweeping allegations about a prison's ability or lack thereof to contain an outbreak." *United States v. Graham*, No. 12-cr-184, 2020 WL 3053106, at *4 (W.D. La. June 8, 2020) (citing *Raia*).

Here, Mr. Iezzi's motion has done just that. The Defendant is afflicted with several conditions that place him at higher risk of severe illness should he contract the COVID-19 virus, such that he is able to differentiate his COVID-19-related concerns from that of other inmates and to explain how his situation rises to an "extraordinary and compelling" level in light of the pandemic. Specifically, the Court reaches such conclusion after considering Mr. Iezzi's situation against the backdrop of the CDC's amended list of "high risk" conditions, which distinguishes between underlying medical conditions that *do* place an individual at increased risk and

underlying medical conditions that *might* place an individual at increased risk. *See People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (last updated July 30, 2020), https://bit.ly/2CrTAqa.

Particular to Mr. Iezzi's situation, the CDC includes two (2) of his current conditions on the "do" list. The CDC notes that "[h]aving chronic kidney disease of any stage increases [an individual's] risk for severe illness from COVID-19." *Id.* And the same goes for his type II diabetes. *Id.* ("Having type 2 diabetes increases your risk of severe illness from COVID-19."). In addition, those conditions are compounded by the fact that Mr. Iezzi also suffers from hypertension, which the CDC includes on the "might" list. *Id.* ("Having other cardiovascular or cerebrovascular disease, such as hypertension (high blood pressure) or stroke, may increase your risk of severe illness from COVID-19."). And, all of that is further compounded by virtue of the fact that Mr. Iezzi is afflicted with several underlying medical conditions that place him at higher risk for severe illness should he contract the COVID-19 virus. *Id.* ("The more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19.").

In the Court's estimation, Mr. Iezzi's current medical conditions rise to an "extraordinary and compelling" level under the non-terminal option. Not only does he have late-stage kidney disease that is approaching qualification as a "terminal illness," but that condition along with two (2) of his other medical conditions place him at higher risk of severe illness should he contract the COVID-19 virus. The compounded and progressive nature of Mr. Iezzi's ailments substantially and materially differentiate his situation from others, such that his conditions appear even more "extraordinary and compelling" for these purposes. But by law, that is not the end of the Court's analysis.

## C.  The § 3553(a) Factors

Even though the Court finds that an "extraordinary and compelling" reason could warrant Mr. Iezzi's release, it must also consider whether release is appropriate in light of the factors set forth in § 3553(a). Specifically, "in considering the section 3553(a) factors, [the Court] should assess whether those factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *United States v. Bess*, --- F. Supp. 3d ----, 2020 WL 1940809, at *10 (W.D.N.Y. Apr. 22, 2020).

In addition, the Third Circuit recently affirmed that the determination of "whether to reduce an eligible defendant's term of incarceration for compassionate release after considering the § 3553(a) factors is committed to the discretion of the [district court]." *United States v. Jones*, No. 12-cr-38, 2020 WL 3871084, at *4 (W.D. Pa. July 8, 2020) (citing *United States v. Pawlowski*, --- F.3d ----, 2020 WL 4281503, at *2 (3d Cir. June 26, 2020)). That discretion includes the district court's ability to consider the length of the defendant's original custodial sentence, including the portions served and remaining, when weighing the § 3553(a) factors. *Pawlowski*, 2020 WL 4281503, at *2.

Here, the Court finds that at least two (2) of the § 3553(a) factors substantially weigh against Mr. Iezzi's release: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the original sentence to deter future criminal conduct and to protect the public from further crimes by the defendant. Specifically, in considering Mr. Iezzi's criminal history, the Court does not conclude that the current nature of his "extraordinary and compelling" circumstances sufficiently mitigate the risk of harm to the community were Mr. Iezzi to be released at this time.

In considering the offense at issue, Mr. Iezzi's 2017 bank robbery was not necessarily the most sophisticated operation. However, it still was a bank robbery, and considering all three (3) of Mr. Iezzi's bank robberies in combination—and the short period of time in between each—causes substantial public safety concern. Mr. Iezzi committed his first bank robbery on September 3, 2002, and he was in custody for that offense until March 11, 2004 (about eighteen (18) months). (ECF No. 54, at 10.) His second bank robbery was committed seven (7) months after his release on October 7, 2004, and he was in custody for that offense until May 1, 2013 (about sixty-seven (67) months). (*Id.* at 11–12.) Then, Mr. Iezzi was in and out of custody for the next three (3) years due to supervised release violations. In November 2016, Mr. Iezzi was sentenced to four (4) months in custody, followed by no period of supervised release. (No. 04-cr-312, ECF No. 166.) He was released in March 2017 and committed his third bank robbery less than a month thereafter on April 13, 2017.

To put it plainly, Mr. Iezzi's criminal history instills very little confidence in the Court that he will refrain from committing future offenses, including more bank robberies, if released at this point, or that release from custody eighty (80) months early is justified.[7] In the Court's estimation, given that among the original principal goals of sentencing was to protect the public and to deter Mr. Iezzi from further criminal conduct, releasing him at this point would likely undermine that goal. For instance, Mr. Iezzi spent about sixty-seven (67) months in custody for the 2004 robbery, which did not deter him from committing the 2017 robbery less than a month after he was released from the period of custody imposed for his final supervised release violation in that case. In that sixty-seven (67) months in custody was not enough to deter Mr.

---

[7] "Mr. Iezzi has been in custody in connection with the present offenses since his arrest on April 13, 2017, which amounts to 36 months of actual incarceration." (ECF No. 121, at 15.) As of the date of this Opinion, Mr. Iezzi has served about forty (40) months of actual incarceration.

Iezzi from committing future offenses, the Court has difficulty concluding that half that amount time would suffice in this case as it is currently before the Court.

To be sure, the Court could look at Mr. Iezzi's present situation and conclude that his deteriorating medical condition has somehow sped up the actual deterrence of further criminal conduct, but regrettably there are substantial reasons cutting in the other direction such that the Court is not convinced that such is the case at this moment in time. Based on the information currently before the Court, there does not appear to be a significant difference between the status of Mr. Iezzi's kidney disease in 2017 when he committed bank robbery number three, the one that led to his current sentence ("nearing stage V" kidney failure) and the current state of his condition ("severe stage IV" kidney failure). The only real change reported is that a fistula has been created so that Mr. Iezzi will be ready to begin dialysis once he reaches end-stage.

While the Court recognizes that Mr. Iezzi may now be experiencing the effects of his kidney disease more so than he was at the time he committed the 2017 robbery, the record does not demonstrate that Mr. Iezzi is at a materially different medical state such that he would be deterred or otherwise constrained from committing future offenses by virtue of his medical condition. The medical information before the Court appears to demonstrate that when Mr. Iezzi committed the bank robbery (his third in fairly rapid succession) that put him in federal prison now, he was already afflicted with chronic and serious kidney disease, and that seemingly did not get in the way of his criminal conduct at that time.

And that concern is further compounded by the fact that Mr. Iezzi, if released, would reside with his 93-year-old mother. Such a release plan does not provide the Court with any additional assurance that Mr. Iezzi would be looked after in a way that would actively deter or prevent him from committing future criminal offenses, or would more significantly meet his

medical conditions any better than they are being met now. To be clear, the Court is not denying Mr. Iezzi's Motion so that he can receive BOP medical care, but it is instead recognizing that the record before the Court does not currently demonstrate that substantially better medical care outside of the BOP is a material reason to modify his current sentence.

Based on the record before it, the Court cannot confidently say that additional incarceration is not needed in order to prevent Mr. Iezzi from committing further serious offenses, or to protect the public from such. And the record now before the Court does not demonstrate that his medical situation has progressed to a state at which his engaging in such repeat conduct is not a genuine possibility. Thus, the Court finds that the "extraordinary and compelling" nature of Mr. Iezzi's medical conditions does not outweigh the § 3553(a) factors.[8]

## IV.   **CONCLUSION**

By every measure this case is a close call for the Court. Mr. Iezzi's medical situation is very serious. The crimes he committed while afflicted with them are also quite serious. The Court has considered the relevant factors set forth in § 3582(c), as well as the applicable policy statements issued by the Sentencing Commission and the factors set forth in § 3553(a). Because the BOP has had more than thirty (30) days to consider Mr. Iezzi's medical conditions, including those conditions considered in the context of the COVID-19 pandemic, the Court concludes that Mr. Iezzi has exhausted his BOP administrative obligations, and that his Motion (in its entirety) is properly before it. And while Mr. Iezzi's medical conditions rise to an "extraordinary and

---

[8] The Court would also note that in terms of his medical care, Mr. Iezzi is currently assigned to a Chronic Care Clinic at a Federal Medical Center. (ECF No. 121, at 3.) FMC Devens is equipped to assist "Care Level 4" inmates and appears to have a core focus on treating inmates with serious kidney afflictions. Based on the record now before the Court, it cannot and does not conclude that the quality of Mr. Iezzi's medical care at FMC Devens is insufficient or inappropriate, which buttresses the Court's conclusion that at this juncture, release is inappropriate. But the Court is concerned that the record now before the Court also appears to indicate that it has been several months since Mr. Iezzi has been seen by the kidney specialist at FMC Devens, which would appear to be an element of the specialty care that took Mr. Iezzi to that location in the first place. One of the reasons the Court is denying the Motion here without prejudice is to preserve its ability to act, and the ability of the parties to request Court action, should the circumstances at a future date, near or far, counsel a different result.

compelling" level, the record presently before the Court indicates that Mr. Iezzi remains a risk to the community such that compassionate release is not appropriate at this time. Accordingly, the Defendant's Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) at ECF No. 121 is DENIED without prejudice subject to its reassertion should circumstances warrant.

An appropriate Order will issue.

s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated:   August 14, 2020

cc:      All counsel of record